707 A.2d 165

STATE-OPERATED SCHOOL DISTRICT OF THE CITY OF NEWARK, APPELLANT, v. ELMORE GAINES, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 4, 1998—Decided March 19, 1998.

Before Judges BAIME and WEFING.

*Teresa L. Moore*, argued the cause for appellant (*McCarter & English*, attorneys; *Steven B. Hoskins*, of counsel; *Ms. Moore*, on the brief).

*David B. Friedman*, argued the cause for respondent Elmore Gaines (*Balk, Oxfeld, Mandell & Cohen*, attorneys; *Mr. Friedman*, of counsel and on the brief).

*Peter Verniero*, Attorney General, did not argue but submitted a statement in lieu of brief for respondent Merit System Board (*June K. Forrest*, Senior Deputy Attorney General, on the statement in lieu of brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

The State Operated School District of the City of Newark (District) discharged Elmore Gaines from his position as senior

security guard for conduct unbecoming an employee, chronic absenteeism and lateness, theft, insubordination, failure to perform, and absence without leave. Gaines appealed to the Merit System Board (Board). The matter was referred to the Office of Administrative Law. Following a hearing, an administrative law judge (ALJ) sustained all but one of the disciplinary charges, but recommended that the penalty be reduced to an eighty day suspension. The Board adopted the ALJ's factual findings, but concluded that a six-month suspension was appropriate. The District appeals, contending that Gaines' repeated acts of misconduct warrant nothing short of dismissal from employment. We agree.

## I.

We briefly summarize the salient facts. Gaines was employed as a senior security guard from 1990 to 1995. His duties included patrolling the thirty-one school buildings in his designated sector, responding to alarms and emergent situations, and securing and protecting all school property. Gaines was assigned to the midnight shift. His patrol activities required him to drive a District-owned automobile. As a condition of his employment, Gaines was required to maintain a valid driver's license.

From the very outset of his employment, Gaines' performance of his duties was abysmal. Between 1992 and 1995, Gaines' driver's license was suspended for substantial periods of time. Gaines never apprised the District of these suspensions, but instead continued to operate the District-owned patrol vehicles. The District's practice was, and continues to be, to obtain driver's abstracts from the Division of Motor Vehicles on a periodic basis. Upon learning of Gaines' suspensions, the District repeatedly warned him that he could not operate a District-owned vehicle. Indeed, the applicable collective bargaining agreement requires District employees to apprise their supervisors when their licenses are suspended. Despite repeated warnings, Gaines continued to operate District-owned vehicles during these periods of suspen-

sions. Although Gaines claimed that his elderly father often misplaced his mail and he was thus uninformed of the suspensions, it is undisputed that he took no measures to correct the situation by, for example, obtaining a post office box. We note that Gaines' driver's license ultimately expired, no attempt having been made to reinstate it. At oral argument, we were told that Gaines does not have a valid driver's license.

Throughout his employment, Gaines received various disciplinary penalties for chronic lateness and absenteeism, and for numerous instances of absences without leave, neglect of duty, failure to perform, and insubordination. For these infractions, Gaines was suspended from employment twice for thirty-day periods and once for fifteen days. Following these episodes of major discipline in 1993 and 1994, Gaines' job performance worsened in 1995. During the first half of 1995, Gaines accumulated some forty-four days of absences, not counting the additional month of absences due to unpaid suspensions. The District's rules require employees to telephone their supervisors when they are unable to work on their assigned hours. Gaines blithely ignored that regulation, and, when confronted by his supervisor with that violation, wrote a profanity-filled, offensive letter of complaint.

Gaines did not dispute the District's evidence. He instead claimed that much of his misbehavior was the result of the psychological sequelae flowing from two incidents in which gunshots were fired at his patrol car. These incidents occurred on March 6, 1995 and July 29, 1995. The perpetrator or perpetrators were never apprehended. Following each incident, Gaines was given substantial sick time leave. Moreover, the District attempted to accommodate Gaines when he returned to work by assigning him to a particular school. However, the District needed patrol officers and ultimately directed Gaines to return to his patrol duties. Gaines refused.

The ALJ dismissed the charge of theft, which related to allegations that Gaines forged a physician note in order to avoid having to return to work. However, the ALJ found that Gaines had

engaged in conduct unbecoming an employee, was chronically absent from work and late, was insubordinate to his supervisor, and was absent without leave. With respect to several of Gaines' absences, acts of insubordination, and driver's license suspensions, the ALJ determined that the employee had previously been disciplined. The ALJ concluded that dismissal from employment was excessive in light of the two shooting incidents we have described. As noted, the ALJ recommended an eighty-day suspension.

The Merit System Board adopted the ALJ's factual findings respecting the disciplinary charges. The Board noted that Gaines' record included four major disciplinary actions during the employee's five and one-half years of service. The Board also noted that Gaines' driving violations, *i.e.*, driving a District-owned patrol car while his license was suspended, were particularly egregious, because Gaines had been suspended previously for the same reason. While rejecting the District's demand for Gaines' removal from service, the Board increased the penalty recommended by the ALJ and suspended the employee without pay for a period of six months.

It is against this factual backdrop that we address the issues presented.

## II.

We are keenly aware of our limited role in reviewing a decision of an administrative agency. *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980). Agency actions are presumptively reasonable. *Smith v. Ricci,* 89 *N.J.* 514, 525, 446 *A.*2d 501, *appeal dismissed sub nom. Smith v. Brandt,* 459 *U.S.* 962, 103 *S.Ct.* 286, 74 *L.Ed.*2d 272 (1982); *Elizabeth Fed. S. & L. Ass'n v. Howell,* 24 *N.J.* 488, 499, 132 *A.*2d 779 (1957); *In re Tavani,* 264 *N.J.Super.* 154, 158, 624 *A.*2d 75 (App.Div.1993). We will reverse a decision of an administrative agency only if it is "arbitrary, capricious or unreasonable or it is not supported by substantial credible evidence in the record as a whole." *Henry v. Rahway*

*State Prison,* 81 *N.J.* at 579–80, 410 *A.*2d 686; *see also Mayflower Sec. Co. v. Bureau of Sec.,* 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973); *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965); *Campbell v. Department of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963).

This much conceded, application of this standard requires more than a perfunctory review. *Mayflower Sec. Co. v. Bureau of Sec.,* 64 *N.J.* at 93, 312 *A.*2d 497. Instead, it calls for careful and principled consideration of the agency record and findings. *Ibid.* Our constitutional authority "cannot be relegated to a mere rubber-stamp of agency action." *Gerba v. Public Employees' Retirement Sys. Trustees,* 83 *N.J.* 174, 190, 416 *A.*2d 314 (1980) (Pashman, J., dissenting). In the context of agency imposed sanctions or penalties, we are obliged to accord deference to the decision rendered, but upon a finding of arbitrariness, we "may either . . . fix[ ] the appropriate penalty or remand [the matter] for redetermination." *Henry v. Rahway State Prison,* 81 *N.J.* at 580, 410 *A.*2d 686.

We, of course, recognize that we have no monopoly on justice. We also acknowledge that a six-month suspension constitutes a serious penalty. We are, nevertheless, satisfied that the Board's decision was clearly a mistaken one and was so plainly unwarranted that the interests of justice demand intervention and correction. Based upon our examination of the record, we harbor the definite conviction that the Board's decision went so wide of the mark that a mistake must have been made.

The objectives of our civil service laws are articulated in *N.J.S.A.* 11A:1–2. They include rewarding employees for "meritorious performance" and "separat[ing]" others whose conduct of their duties is less than adequate. *N.J.S.A.* 11A:1–2c. However phrased, the purpose of these laws "is to improve the efficiency of the public service of the State and its various subdivisions." *Campbell v. Department of Civil Serv.,* 39 *N.J.* at 583, 189 *A.*2d 712. We are convinced that the Board lost sight of this goal.

The Board did not give sufficient weight to Gaines' appalling disciplinary record. Our Supreme Court has said that "[j]ust cause for dismissal can be found in habitual tardiness or similar chronic conduct." *West New York v. Bock,* 38 *N.J.* 500, 522, 186 *A.*2d 97 (1962). While a single instance may not be sufficient, "numerous occurrences over a reasonably short space of time, even though sporadic, may evidence an attitude of indifference amounting to neglect of duty." *Ibid.* As noted by the Court, "[s]uch conduct is particularly serious on the part of employees whose job is to protect the public safety and where the [employees] serve precise shifts to afford continuous protection." *Ibid.* Here, Gaines' employment record is one of habitual misconduct. Gaines' sorry record discloses an overriding indifference to his employment responsibilities. More importantly, it suggests that rehabilitation is, at best, a very remote prospect.

Management is high among present priorities. With pronounced awareness of budgetary constraints, "it is understandable that among the solvents would be a proposal that [government] borrow rudimentary principles from the business world." *State v. Funicello,* 60 *N.J.* 60, 69, 286 *A.*2d 55 (Weintraub, C.J., concurring), *cert. denied,* 408 *U.S.* 942, 92 *S.Ct.* 2849, 33 *L.Ed.*2d 766 (1972). The first rule of good management must be that "management shall manage." *Ibid.* A work force cannot be effective unless it responds to direction. This observation has particular efficacy in the context of providing security services. Defiance in the face of reasonable orders may result in calamity.

We do not expect heroics, but "being there," *i.e.,* appearing for work on a regular and timely basis, is not asking too much. Within that context, Gaines' chronic absenteeism and lateness cannot reasonably be tolerated. We add that Gaines' abject refusal to telephone his supervisor to apprise him of his inability to be present at work on time is simply indefensible and incomprehensible.

A patrol officer who cannot patrol is of no worth. Gaines does not have a valid driver's license and thus cannot patrol. Gaines'

driver's abstract is punctuated with repeated suspensions. The problem is apparently intractable and chronic. Although Gaines' job was one of law enforcement, he repeatedly violated the law by driving the District's patrol vehicles while his license was suspended.

There is no constitutional or statutory right to a government job. Our laws, as they relate to discharges or removal, are designed to promote efficient public service, not to benefit errant employees. The welfare of the people as a whole, and not exclusively the welfare of the civil servant, is the basic policy underlying our statutory scheme. If we were reviewing a private employment case, there can be no doubt but that we would find just cause for dismissal. The public and, more particularly, the school children of the City of Newark deserve no less.

We thus reverse the decision of the Merit System Board and reinstate that of the State Operated School District.